## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
---------------------------------------------------------
                                        :
SECURITIES AND EXCHANGE                 :
COMMISSION,                             :
                                        :        Civil Action No.
                    Plaintiff,          :
                                        :
          v.                            :
                                        :
HITACHI, LTD.,                          :
                                        :
                    Defendant.          :
---------------------------------------------------------
```

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1.      This action arises from violations of the books and records and internal accounting controls provisions of the Foreign Corrupt Practices Act ("FCPA") [15 U.S.C. § 78m(b)(2)(A)-(B)] by defendant Hitachi, Ltd. ("Hitachi").

2.      In 2005, Hitachi created a subsidiary in South Africa for the purpose of establishing a local presence in that country to pursue lucrative public and private contracts, including government contracts to build two new major power stations.

3.      Hitachi sold 25% of the stock in the newly created subsidiary to Chancellor House Holdings (Pty) Ltd. ("Chancellor"), a local South African company that was a front for the African National Congress ("ANC"), South Africa's ruling political party.  Hitachi's arrangement gave Chancellor – and by proxy the ANC – the ability to share in the profits from any power station

contracts secured by Hitachi.  Hitachi also entered into an undisclosed "success fee" arrangement

with Chancellor, wherein Chancellor would be entitled to "success fees" in the event that the

contract awards were "substantially as a result" of Chancellor's efforts.

4.     During the bidding process, Hitachi was aware that Chancellor was a funding

vehicle for the ANC.  Hitachi nevertheless continued to partner with Chancellor and encourage

Chancellor's use of its political influence to help obtain the government contracts.

5.     As a result, Hitachi was awarded power station contracts in South Africa worth

approximately $5.6 billion.[1]  In April and July 2008, Hitachi paid the ANC – through Chancellor –

"success fees" totaling approximately $1 million.

6.     Hitachi's South African subsidiary inaccurately recorded its "success fee" payments

to Chancellor as "consulting fees" in its books and records for the year ended December 31, 2008.

The inaccurate books and records of Hitachi's subsidiary were consolidated into Hitachi's financial

statements for the fiscal year ended March 31, 2009, which were filed with the Commission.

7.     In 2010, Hitachi's South African subsidiary also inaccurately recorded a dividend

worth over a million dollars to be paid to Chancellor, its 25% shareholder.  The journal entry

recorded this dividend as "Dividends Declared" in the subsidiary's books and records for the year

ended December 31, 2010.  The books and records did not reflect that the dividend was, in fact, an

amount due for payment to a foreign political party in exchange for its political influence in

assisting Hitachi land two government contracts.  The subsidiary's inaccurate books and records

---

[1]     Where contract amounts, success fees, dividend declarations, and other figures were in
South African rand, those figures have been converted to U.S. dollars at the exchange rate
prevailing at the relevant time.

were consolidated into Hitachi's financial statements for the fiscal year ended March 31, 2011, which were filed with the Commission.

8.      Hitachi has violated, and unless enjoined will again violate, Section 13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(b)(2)(A)] by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Hitachi.  Hitachi also has violated, and unless enjoined will again violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded in accordance with management's general or specific authorization; that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; that access to assets was permitted only in accordance with management's general or specific authorization; and that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa].

10.      Venue in the District of Columbia is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts or transactions constituting federal securities law violations occurred in this district and, at the time of the violations, Hitachi transacted business in this district.

The Commission is headquartered in the District of Columbia and filings with the Commission occur in this district.

**DEFENDANT**

11.     Hitachi, Ltd. is a multinational conglomerate that, among other things, designs and constructs power stations.  The company is headquartered in Tokyo, Japan and, including its subsidiaries, has more than 320,000 employees worldwide.

12.     At the time of the violations, and from at least January 1, 2005 until April 26, 2012, Hitachi's American Depositary Shares ("ADSs") – representing shares of common stock – were registered with the Commission under Section 12(b) of the Exchange Act [15 U.S.C. § 78l] and were listed and traded on the New York Stock Exchange.  Hitachi was an issuer of securities in the United States and filed reports on Form 20-F with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m].  On April 16, 2012, Hitachi filed a Form 25 with the Commission voluntarily withdrawing its ADSs from listing and registration.  The delisting was effective ten days later, on April 26, 2012, and Hitachi's duty to file reports under Section 13(a) of the Exchange Act was automatically suspended at the same time as the delisting.  On April 27, 2012, Hitachi filed a Form 15F with the Commission voluntarily terminating its registration under Section 12(g) of the Exchange Act and terminating its duty to file reports pursuant to Section 15(d) of the Exchange Act.  Termination of Hitachi's registration and duty to file reports with the Commission became effective on July 26, 2012.  Hitachi's ADSs continue to be traded on the U.S. over-the-counter market.  If Hitachi were to file a new registration statement registering an offering of its securities pursuant to the Securities Act of 1933 [15 U.S.C. §§ 77a, *et seq.*], or a new Exchange Act registration statement registering a class of its securities under Section 12 of the

Exchange Act, it would once again become subject to reporting obligations under Section 13(a) or 15(d) of the Exchange Act.

## OTHER RELEVANT ENTITIES

13.     Hitachi Power Europe GmbH ("HPE") was an international supplier of boilers for power stations.  Before 2006, HPE was known as Babcock Hitachi Europe GmbH.[2]  At all relevant times, HPE was a wholly-owned subsidiary of Hitachi based in Germany.  In 2014, HPE's projects and personnel were transferred to a joint venture formed between Hitachi and another Japanese conglomerate.

14.     Hitachi Power Africa (Pty) Ltd. ("HPA") executed power station orders in South Africa.  HPA was established in 2005 and, at all relevant times, was a majority-owned subsidiary of HPE based in South Africa.  In 2014, HPA's projects and personnel were transferred to the joint venture above.

15.     The African National Congress has been the ruling political party of the Government of South Africa since 1994.

16.     Eskom Holdings SOC Ltd. ("Eskom") is a government-owned and government-run public utility established by the Government of South Africa.  Eskom supplies approximately 95% of all electricity in South Africa and the Government of South Africa is Eskom's sole shareholder.  Thus, Eskom is an instrumentality of a foreign government.  From 2006 to at least 2008, Eskom's chairman simultaneously served as a member of the ANC's National Executive Committee.

17.     Chancellor House Holdings (Pty) Ltd. is a South African investment firm created by the ANC as a funding vehicle.  Chancellor was named after a building in downtown

---

[2]      HPE and its predecessor entity, Babcock Hitachi Europe GmbH, are collectively referred to herein as "HPE."

Johannesburg that in the 1950s housed the law firm of Nelson Mandela and Oliver Tambo, two future ANC presidents.  From 2005 to at least 2008, Chancellor's parent organization, Chancellor House Trust, was administered by a member of the ANC National Executive Committee and a director of Eskom Enterprises, an Eskom subsidiary.

## FACTUAL ALLEGATIONS

### Background of Hitachi's Effort to Enter the South African Power Market

18.     In 2003, Hitachi began looking to enter the South African power market.  At the time, Eskom, the largest government-owned and government-run public utility in South Africa, was planning to build new power stations in South Africa.  Through its subsidiary in Europe, Hitachi hired an expert in the South African power industry as a consultant to explore the potential business opportunity.  HPE's consultant met with public and private power producers, including Eskom, and learned of Eskom's plans to build two new power stations, the Medupi power station and the Kusile power station.

19.     HPE's consultant – who was later appointed as an executive at HPA – never received training from Hitachi regarding compliance with the FCPA.  In fact, neither HPE nor HPA conducted any FCPA-specific compliance training for any HPE or HPA officers or employees between January 2005 and December 2008.

20.     In April 2005, HPE held meetings in South Africa with senior Hitachi executives to discuss the business opportunities in that country.  Hitachi decided to form a subsidiary in South Africa – the entity that would become known as HPA – for the purpose of establishing a local presence to help Hitachi pursue contracts with public and private entities in South Africa, including the Eskom power station contracts.

21.     The attendees of the April 2005 meetings also agreed that, in establishing a local presence in South Africa, Hitachi would seek to identify a local black-owned entity or entities with whom HPA could partner in connection with its submission of bids, or "tenders," for government business.  By partnering with a local black-owned entity, HPA would seek to qualify under the requirements of South Africa's Black Economic Empowerment Act of 2003 ("BEE"), which promoted participation in the South African economy by companies that were at least 25% owned by black South Africans or black-owned South African entities.  In general, companies that qualified under the terms of the BEE enjoyed preferential status in government procurements.

**Before Submitting Tenders to Win the Eskom Contracts, Hitachi Enters into a Relationship with Chancellor**

Hitachi Identifies Chancellor for a 25% Equity Stake in HPA

22.     In seeking local BEE partners, HPE prioritized a prospective partner's ability to exert political influence over engineering or operational capacity.  Consistent with this criterion, Hitachi identified Chancellor as a potential partner.  Hitachi understood, and it was commonly known, that both Chancellor and its parent organization, Chancellor House Trust, had extensive political connections within the Government of South Africa, with the ANC, and with Eskom.  For example, Hitachi knew or could have learned:

- An administrator of Chancellor House Trust was a member of the ANC National Executive Committee from 2002 to 2007;

- The chairman of Eskom's board of directors, who also was a member of the ANC National Executive Committee, co-owned a separate investment company with the chairman of Chancellor House Trust;

- An administrator of Chancellor House Trust also was a director of Eskom Enterprises, an Eskom subsidiary; and

- Chancellor's chairman was married to a family member of Eskom's chief executive officer.

23.     While its political connections were extensive, Chancellor lacked any engineering or operational capabilities that could assist Hitachi with contract performance should it secure the Eskom contracts.  Chancellor differed in this respect from at least one other local South African entity that Hitachi initially considered for partnership with HPA.

24.     Hitachi was fully aware of Chancellor's operational shortcomings, and sought a partnership with Chancellor precisely because Chancellor would *not* provide it operational support. From an internal profile of Chancellor prepared in 2005, HPE's senior management was advised that Chancellor "has a lean HQ staff and it does not get involved in the operational business of the companies in which it invests.  Support for invested companies is provided via networking at board level."  The internal profile also specifically highlighted Chancellor's "good connections within Eskom."

25.     Another 2005 Hitachi document identified Chancellor as a "potentially suitable" BEE partner that was "politically preferred."  In the document's margin next to the discussion of Chancellor are handwritten notes of an HPE executive that include the words  "recommendation by Escom [sic]" and "ANC treasury."

26.     In a 2010 email, a Hitachi executive who also had served as an alternative director of HPA in South Africa in 2005 and 2006 wrote to senior Hitachi officials in Japan:  "When we adopted [Chancellor] at the time of HPA establishment, we took ANC influence into consideration and still we believed it was a right decision."

8

27.     In October 2005, HPE conducted Hitachi's due diligence of Chancellor.  This due diligence work lasted only a few days' time and was not conducted in accordance with any existing Hitachi procedures.  During the course of the Commission's investigation, Hitachi was unable to locate its report reflecting the due diligence conducted of Chancellor.

28.     On November 24, 2005, HPE formally entered into a shareholders' agreement with Chancellor.  Pursuant to this agreement, Hitachi – through HPE – sold Chancellor a 25% equity stake in the newly formed HPA.  Hitachi also sold a 5% equity stake in HPA to another local entity – a small five-person women's group – with HPE maintaining the remaining 70% of the equity in HPA.  In February 2006, a public launch ceremony was held, at which HPA and its BEE shareholders were introduced to the public.

29.     The shareholders' agreement expressly provided that Chancellor's "contribution" to HPA would include, among other things, "lobbying the public and the private sector in the Republic for new business and to promote [HPA's] expansion initiatives and to enhance and/or protect [HPA's] existing and future business interests within the Republic" and "assistance in the identification, preparation, processing, monitoring, support and procuring of tenders from central, provincial and local government, parastatals and the private sector."

30.     Hitachi charged Chancellor only approximately $190,819 for its 25% equity stake in HPA.  In addition, as part of the transaction, Chancellor obtained a seat on HPA's board, with Chancellor's chairman becoming a director of HPA.

31.     In an email dated April 20, 2010, an HPE executive stated, "After [an HPA executive] evaluated each company, he chose ANC-related CH[ancellor] (25%) and a lady-group (5%) (5 members then), which included the lady … who had a good relationship with the Mbeki Administration, to achieve 30%."

The Undisclosed "Success Fee" Arrangement

32.     An October 2005 draft of the shareholders' agreement for HPA included a specific provision pursuant to which Chancellor would be financially rewarded in the event that its efforts substantially resulted in Hitachi winning a government contract.

33.     In a November 1, 2005 email, an HPA executive circulated a revised draft of the shareholders' agreement in which the "success fee" provision had been removed from the attached revised draft.  In the transmittal email, HPA stated that HPE "supports the principle of rewarding success" but that such an arrangement "will be dealt with in a separate document."

34.     HPA removed the "success fee" arrangement from the shareholders' agreement at the direction of HPE.  As HPA explained in the November 1, 2005 email, "HPA will be required to disclose the shareholders['] agreement when BEE audits are conducted by customers, and it is felt that such a clause could be interpreted in a way in which it is not intended."

35.     Thereafter, Hitachi memorialized its promise to pay Chancellor for its exertion of influence during the Eskom tender process in a separate, unsigned side-arrangement.  The arrangement was memorialized in a document entitled, *Proposal for payment of success fees to HPA'[s] Empowerment Shareholders* (the "Success Fee Arrangement"), which stated, in part:

> [HPE] and HPA believe in rewarding success where it is due. …
> Entitlement to payment of a success fee will be dependent upon the
> active involvement and support provided to HPA during the tender /
> adjudication phase of a project, and the award of an order to HPA
> must be substantially as a result of [Chancellor's] efforts within [its]
> responsible sphere of influence.

36.     In August 2006, an HPE executive reported to HPE's board of directors that HPE and HPA had agreed to a "success fee" arrangement with its BEE partners "as an incentive to them to help the Company win orders."

**After Entering into a Success Fee Arrangement with Chancellor, Hitachi Submits Tenders for Work on Two Power Stations**

37.     In May 2006, Eskom invited Hitachi and other contractors to tender for work involved in building the Medupi power station.  The project included both the boiler and turbine components of the power station.  In November 2006, Hitachi – through HPE and HPA bidding in consortium – formally tendered for work on both the boiler and turbine components.  Shortly thereafter, Hitachi withdrew its tender for the turbines for capacity reasons and proceeded with just its tender to build the boiler works.

38.     Later, in the summer of 2007, Eskom also initiated a non-tender process for the Kusile power station and invited Hitachi to submit an offer for work on the boiler component.  Hitachi – again, through HPE and HPA bidding in consortium – then submitted its initial offer for work on the boiler component of the Kusile power station.

39.     Hitachi considered its entry into the South African power market a high corporate priority, and HPA's tenders for the Eskom contracts had the personal attention of Hitachi's senior management in Japan.  On July 20, 2007, a high-level Hitachi executive wrote to the Minister of South Africa's Department of Public Enterprises, the ministry with oversight responsibility for Eskom, that he and Hitachi "fully support" HPA's power station tenders, and that "I am continuously monitoring the development of the [Medupi] project."

**During the Pendency of the Eskom Tenders, the ANC Confirms that Chancellor Is an ANC Funding Vehicle**

40.     While Hitachi was preparing and submitting its first tender for the Medupi power station, the South African press publicly exposed Chancellor – with whom Hitachi had entered into both a shareholders' agreement and an undisclosed "success fee" arrangement – as an *alter ego* of the ANC.

11

41.      In August 2006, an HPA director received a telephone call from a reporter with the *Mail & Guardian*, a South African weekly newspaper that focuses on political analysis, investigative reporting, and South African news and culture.  The reporter asked HPA to comment on whether there was a link between HPA's 25% shareholder, Chancellor, and the ANC.  HPA declined to comment.

42.      On November 10, 2006, the same day that Hitachi submitted its bid for the Medupi power station contract, the *Mail & Guardian* published an article entitled, The ANC's New Funding Front.  The article exposed Chancellor as a business front set up by the ANC "to seek profit on its behalf," generally by acquiring "empowerment" stakes in businesses seeking state procurements.  "This means," the *Mail & Guardian* stated, "the ANC, as ruling party, has been both player and referee."

43.      Both HPA and HPE were aware of the *Mail & Guardian*'s reporting on Chancellor's relationship to the ANC.  On November 13, 2006, an HPA director forwarded two HPE executives a copy of The ANC's New Funding Front.  The same HPA director reported to the HPE executives that he had spoken to Chancellor's chairman, who had denied the allegations in the newspaper.

44.      In January 2007, both the *Mail & Guardian* and a separate South African newspaper, the *Financial Mail*, published articles that confirmed Chancellor was a funding vehicle for the ANC.  In Financing the ANC, published on January 19, 2007, the *Financial Mail* quoted the ANC Secretary General and organizational head of the ANC's operations as admitting that Chancellor was an "ANC vehicle" that existed for the sole purpose of funding the ANC.  The *Mail & Guardian* reported this same admission by the ANC Secretary General a week later, in an article entitled, ANC Admits It Used BEE Funding Front.

45.     After the ANC Secretary General acknowledged publicly that Chancellor was an ANC funding "vehicle," an HPA director spoke to Chancellor's chairman, who admitted this fact.

**Hitachi Continues to Encourage Chancellor to Exert Its Political Influence to Assist in Winning the Eskom Contracts**

46.     Notwithstanding confirmation in the press that Chancellor was an ANC *alter ego*, and thus a foreign political party, Hitachi maintained its relationship with Chancellor.  As pressure from Hitachi executives in Japan mounted, HPE and HPA continued to encourage Chancellor to exert its political influence to win the Eskom contracts.

47.     As specified in the shareholders' agreement, Chancellor networked to help schedule meetings with government officials and lobbied on behalf of the HPE and HPA consortium bid.

48.     On May 22, 2007, an executive at Hitachi, Ltd. Power Systems, an internal division of Hitachi, emailed the management team of HPE that, "[g]iven the potential of the South African market and its importance for Hitachi group, HPE together with Hitachi Power Systems Group shall devote every effort to winning [the Medupi boiler contract]."  A second email sent a week later relayed that Hitachi in Japan was "worr[ied] about the current situation."

49.     In a May 30, 2007 email, an HPE executive emailed other Hitachi executives that, even though HPE and HPA "had not been successful in receiving any update [from Eskom]," Chancellor and HPA's 5% shareholder were doing "their very best" to bring Hitachi's offer for the Eskom contracts "in first place."

50.     In August 2007, Eskom issued a letter of award for the boiler and turbine components of the Medupi power station to the only bidder competing with Hitachi, a consortium led by a large French multinational company.

13

51.     In mid-September 2007, HPE learned that there were difficulties in the negotiations between Eskom and the French consortium for the Medupi boiler works. HPE directed Chancellor to help Hitachi win reconsideration of the boiler component of the Medupi power station contract.

52.     On October 8, 2007, HPE executives executed a code of conduct for HPE that, among other things, specifically prohibited contributions to political parties and required compliance with all laws. Despite this code of conduct, HPE continued in its relationship with Chancellor to win government contracts from Eskom.

53.     On October 15, 2007, an HPE executive emailed an internal Hitachi memorandum on the status of the Eskom negotiations to another HPE executive. Under the headings "Decision Criteria" and "Main influencing criteria," the memorandum expressed confidence that Eskom's ANC-led board would favor Hitachi: "Balance of political power in board (ANC driven currently in our favour)."

54.     This prediction proved correct. On October 30, 2007, Eskom and Hitachi – through HPE and HPA – executed the first of two contracts: a $2.91 billion contract to build the boiler works for the Medupi power station.

55.     In December 2007, the *Financial Mail* published another article about Hitachi's relationship with Chancellor. The *Financial Mail* quoted an HPE executive as saying that there was "no proof" that Chancellor was an ANC front company and if Chancellor was indeed a front for the ANC, "this would contradict our own governance rules." In fact, as Hitachi knew well before December 2007, and as the ANC's Secretary General had confirmed publicly eleven months earlier, Chancellor was an *alter ego* of the ANC.

14

56.     A week after the publication of the *Financial Mail* article, on December 14, 2007,

Eskom and Hitachi – through HPE and HPA – executed the second of two contracts:  a $2.71

billion contract to build the boiler works for the Kusile power station.

57.     The Medupi and Kusile power station contracts together accounted for

approximately $5.6 billion in business being awarded to Hitachi by Eskom, among the largest

government contracts ever awarded in South African history.

**HPA Pays Chancellor, an ANC Front, Over $1.1 Million in Success Fees, Declares
Substantial Dividends to Chancellor, and Inaccurately Records these Transactions in Its
Books and Records**

58.     On April 14, 2008, HPA held its annual shareholders meeting.  As reflected in the

meeting minutes, HPA agreed to pay a success fee to Chancellor to reward Chancellor for its

assistance in helping Hitachi secure the Eskom power station contracts.

59.     Subsequently, Chancellor submitted two invoices to HPA for success fees, which

Chancellor called "tender support" fees.  On April 30, 2008, HPA paid Chancellor a success fee of

approximately $965,222, based on the Medupi and Kusile power station contracts.  On July 2,

2008, HPA paid Chancellor a second success fee of approximately $158,160, based on Eskom's

acceptance of an option to expand the Kusile power station contract by another two boilers.

Overall, HPA paid success fees to Chancellor totaling approximately $1,123,382.

60.     HPA recorded the success fees in its "consulting fees" expense account.  The

"consulting fees" account was included in the profit and loss line item "Administrative and other

expenses" in HPA's Annual Financial Statements for the year ended December 31, 2008.  Those

financial statements were consolidated into Hitachi's financial statements and filed with the

Commission on Hitachi's Form 20-F for the fiscal year ended March 31, 2009 (filed July 27,

2009).

61.     HPE and HPA knew that its "success fee" payments were in fact payments to the ANC, a foreign political party.  While suggesting that Hitachi was contractually committed to make these payments, an HPA executive further explained in an August 2012 recorded interview:

> One also has to be sensitive to a foreign company operating in [South Africa] where you have been alerted to the fact that now in fact, you actually have a political party shareholder who is in government.  It's difficult; we were caught between a rock and a hard place.  If we treat them really badly, who knows what can happen?  We are dealing with a state-owned enterprise where the bosses are appointed by the ANC.

62.     On October 15, 2008, HPA executives executed a code of conduct for HPA.  Like the code of conduct executed by executives at HPE a year earlier, the HPA code of conduct, among other things, specifically prohibited contributions to political parties and required compliance with all laws.

63.     As a result of Hitachi winning the Eskom power station contracts, Chancellor, as a 25% shareholder in HPA, was entitled to receive a 25% share of future profits derived from the contracts in the form of HPA dividends.  In 2010 and 2011, HPA declared and recorded a liability in its books and records for dividends to be paid to Chancellor.  HPA's journal entries for these transactions did not reflect that the dividends were, in fact, amounts due for payment to a foreign political party for its assistance in securing government contracts.

64.     On March 18, 2010, HPA declared a dividend of approximately $7,032,680 for all shareholders based on 2009 profits, of which Chancellor was due a dividend of approximately $1,758,170.

65.     On April 30, 2010, HPA recorded a journal entry for "Dividends Declared 18 March 2010" as a liability, with a corresponding reduction of equity in HPA's books and records for the year ended December 31, 2010.  This dividend declaration reflected on the books and

records of HPA was consolidated into Hitachi's financial statements, and filed with the Commission on Hitachi's Form 20-F for the fiscal year ended March 31, 2011 (filed June 24, 2011).

66.     The following year, in March 2011, HPA declared a dividend of approximately $13,073,300 for all shareholders based on 2010 profits, of which Chancellor was due a dividend of approximately $3,268,325.  On March 25, 2011, HPA recorded a journal entry for "Dividend Declaration based on 2010 results" as a liability, with a corresponding reduction of equity in HPA's books and records for the year ended December 31, 2011.  This dividend declaration reflected on the books and records of HPA was consolidated into Hitachi's financial statements for the year ended March 31, 2012.

67.     Hitachi, however, temporarily withheld payment of the 2010 and 2011 dividends to Chancellor.  In an addendum to the shareholders' agreement that HPE and Chancellor executed in late May 2012, Chancellor provided its assurance that it would not pass on dividend payments from Hitachi to any political party or official.  Then, on or about June 29, 2012, Hitachi paid Chancellor approximately $5,027,170 in what Hitachi deemed dividends and interest on such dividends.

68.     Approximately nineteen months later, in February 2014, HPE repurchased Chancellor's shares in HPA – shares that Chancellor had purchased in 2005 for only approximately $190,819 – for approximately $4.4 million.

69.     Thus, in total, Chancellor – the ANC's funding vehicle – received approximately $10.5 million from Hitachi, a return of over 5,000% on its investment in HPA.

70.     During the time it was registered with the Commission, Hitachi failed to devise and maintain an adequate system of internal accounting controls.  HPE and HPA were able to enter into

17

a shareholders' agreement and an undisclosed "success fee" arrangement with Chancellor – a front

for the ANC – to pay that entity for exerting its political influence. Although HPE had a code of

conduct in place before the success fees were paid that specifically prohibited contributions to

political parties, HPA paid Chancellor more than $1.1 million pursuant to this side-arrangement.

HPA was able to do so despite a stream of reporting in the South African media that publicized the

fact that HPA's 25% shareholder was a funding vehicle for the ANC.

71.    HPA also was able to record Chancellor's invoices for success fee payments as

"consulting" expenses, which they were not, without proper documentation or reasonable detail.

Hitachi's internal accounting controls failed again when Hitachi declared and recorded as

dividends to be paid to Chancellor transactions that, in fact, would instead be payments to a foreign

political party for its assistance in securing government contracts. Among other further internal

accounting controls deficiencies, Hitachi failed to conduct adequate due diligence of Chancellor, a

potential agent and a potential shareholder of HPA, and to keep records of such due diligence, even

though Hitachi intended for Chancellor to use its political influence to help obtain government

contracts.

72.    Hitachi's internal accounting controls, or lack thereof, also were inadequate to

provide reasonable assurances that Hitachi would not violate its own codes of conduct and

compliance policies, the FCPA, or South African law. For example, Hitachi failed to adequately

supervise and ensure compliance with its policies and procedures, and neither HPE nor HPA

conducted any FCPA-specific compliance training during the time period in which Hitachi –

through HPE and HPA – was seeking lucrative contracts with an instrumentality of a foreign

government and authorizing the payments of "success fees" to a foreign political party.

## FIRST CLAIM FOR RELIEF

### Hitachi Violated Section 13(b)(2)(A) of the Exchange Act

73.     Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

74.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books,

records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and

dispositions of their assets.

75.     As described above, Hitachi failed to make and keep books, records, and accounts

as required by Section 13(b)(2)(A) of the Exchange Act.

76.     By reason of the foregoing, Hitachi violated, and unless enjoined will again violate,

Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM FOR RELIEF

### Hitachi Violated Section 13(b)(2)(B) of the Exchange Act

77.     Paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

78.     Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a

system of internal accounting controls sufficient to provide reasonable assurances that transactions

are recorded in accordance with management's general or specific authorization; that transactions

are recorded as necessary to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements, and to

maintain accountability for assets; that access to assets is permitted only in accordance with

management's general or specific authorization; and that the recorded accountability for assets is

compared with the existing assets at reasonable intervals and appropriate action is taken with

respect to any differences.

79.     As described above, Hitachi failed to devise and maintain a system of internal accounting controls as required by Section 13(b)(2)(B) of the Exchange Act.

80.     By reason of the foregoing, Hitachi violated, and unless enjoined will again violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

A.     Permanently restraining and enjoining Hitachi, and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it who receive actual notice of this injunction by personal service or otherwise, from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & 78m(b)(2)(B)];

B.     Ordering Hitachi to disgorge all ill-gotten gains, illegal losses avoided, and unjust enrichment wrongfully obtained as a result of its illegal conduct, plus prejudgment interest thereon;

C.     Ordering Hitachi to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D.      Granting such other and further relief as the Court deems just and appropriate, including such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].


Dated:   September 28, 2015                    Respectfully submitted,

                                               _____
                                               David S. Johnson, D.C. Bar No. 477298
                                               Matthew P. Cohen, D.C. Bar No. 469629
                                               Jon B. Jordan, D.C. Bar No. 453344
                                               Securities and Exchange Commission
                                               100 F Street, N.E.
                                               Washington, D.C. 20549
                                               Telephone:  (202) 551-2218 (Johnson)
                                                           (202) 551-7276 (Cohen)
                                               Facsimile:  (202) 772-9282
                                               Email:  johnsonds@sec.gov
                                                       cohenma@sec.gov

Of Counsel:

Thierry Olivier Desmet
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131